**FIRST DIVISION**
**BROWN, C. J.,**
**BARNES, P. J., and WATKINS, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**March 13, 2026**

# In the Court of Appeals of Georgia

A25A1889. EMORY HEALTHCARE, INC. et al v. HARMS.

WATKINS, Judge.

The litigation that gave rise to this appeal concerns peer review proceedings at Emory Johns Creek Hospital ("EJCH"). Orthopaedic surgeon Jason Harms brought a multi-count complaint against several defendants, alleging, generally, that they engaged in a "witch hunt" and wrongfully interfered with his ability to practice. The defendants filed motions to dismiss and strike all of Dr. Harms's claims under OCGA § 9-11-12(b)(6) and Georgia's anti-SLAPP statute, OCGA § 9-11-11.1. After the trial court denied their motions, they filed this appeal. For the reasons discussed below, we conclude that the trial court erred by denying the motions except as to Dr. Harms's tortious-interference claims. Accordingly, we affirm in part and reverse in part.

The facts giving rise to this case are not in dispute. Dr. Harms was employed by Resurgens Orthopaedics, LLC ("Resurgens") and had privileges at EJCH. In April 2024, after complications in several cases, Dr. Harms was placed under "a precautionary suspension[.]" The hospital's Medical Executive Committee ("MEC") initiated an investigation which lasted for several months. During that time, Dr. Harms experienced various limitations to his clinical privileges, as detailed below. Ultimately, in August 2024, the MEC reinstated Dr. Harms's privileges subject to a performance improvement plan ("PIP").

In response to the PIP, Dr. Harms demanded that the MEC either grant him a hearing or, preferably, allow him to relinquish his privileges at EJCH in good standing. EJCH responded that the PIP did not trigger the right to a hearing under the Medical Staff Bylaws, Policies, and Rules and Regulations of Emory Hospitals: Credentials Policy ("Credentials Policy") and noted that Dr. Harms could resign voluntarily.

Shortly thereafter, Resurgens advised Dr. Harms that it had decided not to renew his employment agreement "after careful consideration of the current uncertainty regarding [his] hospital privileges." Dr. Harms then formally relinquished his clinical privileges at EJCH. He contacted Northside Hospital to inquire about

establishing privileges there, but after speaking with representatives at EJCH,[1] Northside's leaders told Dr. Harms they would not grant him privileges.

Dr. Harms filed suit against Emory Healthcare, Inc. (the entity that owns EJCH), Dr. Shawn Tritt (EJCH's Chief Medical Officer and the head of its MEC), and Dr. Bernard Drexinger, a neurologist who prepared reports that were reviewed during the investigation. He sought a declaratory judgment holding that he was entitled to a hearing under the Health Care Quality Improvement Act ("HCQIA")[2] and that the defendants' failure to provide such a hearing means they are not entitled to the immunity from liability afforded by the Act ("Count 1") and raised the following claims: violation of the hospital's bylaws, as to Emory, based on its failure to provide a hearing ("Count 2"); breach of duty, as to Drs. Tritt and Drexinger, based on their failure to be honest and truthful during the peer review process ("Count 3"); defamation, as to all defendants, based on their sharing of false and misleading information with Northside Hospital ("Count 4"); and tortious interference with prospective and existing business relationships, as to all defendants,

---

[1] Dr. Harms signed a waiver allowing Northside to obtain records from EJCH.

[2] USC § 11111, et seq.

regarding Northside and Resurgens ("Count 5"). Notably, Dr. Harms stated on the record that he plans to voluntarily dismiss his defemation claim, and he has confirmed in his brief on appeal that he does not intend to pursue any claim regarding Northside.

The defendants filed motions to dismiss under OCGA § 9-11-12(b)(6) and motions to strike under OCGA § 9-11-11.1, Georgia's anti-SLAPP statute. Following a hearing, the trial court summarily denied the defendants' motions. This appeal ensued.[3]

1. The defendants contend the trial court erred in failing to grant their motions to strike Dr. Harms's breach of duty, defamation, and tortious interference claims. The motions to strike were brought pursuant to Georgia's anti-SLAPP statute, OCGA § 9-11-11.1, which "is intended to protect persons exercising their constitutional rights of petition and freedom of speech."[4] Under the Statute,

> [a] claim for relief against a person or entity arising from any act of such person or entity which could reasonably be construed as an act in furtherance of the person's or entity's right of petition or free speech

---

[3] An order denying a motion to strike or motion to dismiss under the anti-SLAPP statute is directly appealable. See OCGA § 9-11-11.1(e); OCGA § 5-6-34(a)(13).

[4] See OCGA § 9-11-11.1(a).

under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern shall be subject to a motion to strike unless the court determines that the nonmoving party has established that there is a probability that the nonmoving party will prevail on the claim.[5]

There is a two-step process for determining whether a claim is subject to being stricken under this provision. First, the defendant bringing the motion to strike must make "a threshold showing that the challenged claim is one arising from protected activity."[6]

The moving party meets this burden by demonstrating that the act underlying the challenged claim could reasonably be construed as fitting within one of the categories spelled out in OCGA § 9-11-11.1 (c) (1)-(4). These categories include any written or oral statement (1) "made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law"; (2) *made "in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law"*; (3) "made in a place open to the public or a public forum in connection with an issue of public interest or concern"; or (4) "[a]ny other conduct in furtherance of the

---

[5] OCGA § 9-11-11.1(b).

[6] *Giraldi v. Bowen*, 374 Ga. App. 347, 350(1) (912 SE2d 724) (2025) (citation and punctuation omitted).

5

exercise of the constitutional right of petition or free speech in connection with a public issue or an issue of public concern.[7]

Second, if the defendant makes such a showing, "[t]he burden then shifts to the plaintiff to demonstrate that there is a probability that [ ]he will prevail on [his] claims at trial."[8] "Only a claim that satisfies both prongs of the anti-SLAPP statute — i.e., that arises from protected activity *and* lacks even minimal merit — is a SLAPP that is subject to being stricken."[9]

"[The appellate court] generally review[s] a trial court's ruling on an anti-SLAPP motion to strike de novo, viewing the pleadings and affidavits submitted by the parties in the light most favorable to the plaintiff (as the non-moving party)."[10]

With this framework in mind, we now turn to the claims the defendants contend should have been stricken.

---

[7] Id. at 350-351(1) (citations and punctuation omitted; emphasis added).

[8] *Neff v. McGee*, 346 Ga. App. 522, 525 (816 SE2d 486) (2018), overruled on other grounds, *Oskouei v. Matthews*, 321 Ga. 1, 26(4), n.26 (912 SE2d 651) (2025).

[9] *Wilkes & McHugh, P.A. v. LTC Consulting, L.P.*, 306 Ga. 252, 262-63(2) (830 SE2d 119) (2019) (citation and punctuation omitted).

[10] *Am. Civil Liberties Union v. Zeh*, 312 Ga. 647, 652 (1)(c) (864 SE2d 422) (2021) (citations omitted).

### (a) Defamation (Count 4)

Dr. Harms's defamation claim was based on the defendants' communications with Northside Hospital. As mentioned above, Dr. Harms has expressly and repeatedly advised that he does not intend to pursue any claim regarding Northside. Because Dr. Harms has abandoned this claim, we decline to review whether the trial court erred in allowing it to proceed.

### (b) Breach of Duty (Count 3)

Dr. Harms brought breach of duty claims against Drs. Tritt and Drexinger, based on the allegation that they submitted inaccurate reports during the peer review process. Specifically, Dr. Harms asserts that Drs. Tritt and Drexinger had a duty to make honest and truthful reports in the peer review process and that they breached their duty by submitting a modified report which they knew was false. As specific facts supporting these claims, Dr. Harms alleges that Dr. Drexinger's initial neuromonitoring report, which he prepared within days of patient T. H.'s surgery, indicated that T. H. experienced a loss of motor function only, but his revised report indicated that T. H. experienced a near-total loss of neurological function and falsely stated that Dr. Harms was aware of T. H.'s loss of function. Dr. Harms further alleges

7

that Dr. Drexinger prepared and submitted the revised report at the behest of the MEC, and that Dr. Tritt knew or should have known the modified report was false. Finally, Dr. Harms alleges that the foregoing actions were based entirely on malice and animus toward him.

(i)　First, we must determine whether these claims arise from protected activity. Despite Dr. Harms's insistence to the contrary,[11] we agree with the defendants that these breach of duty claims are based on statements the defendants made in connection with the peer review process. The question, then, is whether the peer review process constitutes "an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law" under OCGA § 9-11-11.1(c)(2).

Although it appears to be an issue of first impression in Georgia, California courts have long recognized hospital peer review proceedings as official proceedings

---

[11] In his brief on appeal, Dr. Harms asserts: "The claims [the defendants] seek to strike are not based upon things [they] said during the peer review process; the claims are based upon things [the defendants] did or failed to do." But as to "things" the defendants did or failed to do, Dr. Harms has alleged only that they submitted false reports during peer review and that they failed to be honest in their reports during peer review.

authorized by law within the meaning of the anti-SLAPP statute.[12] Because the current version of Georgia's anti-SLAPP statute substantially tracks California's anti-SLAPP procedure, we routinely look to California case law for guidance on interpreting OCGA § 9-11-11.1.[13] And while the peer review process in Georgia is not identical to the process in California, both states have enacted laws and regulations setting forth a comprehensive framework for peer review. Notably, Georgia law requires hospitals to "implement measures, including peer review, to monitor the on-going performance of the delivery of patient care by those granted clinical privileges,"[14] and to report certain peer review outcomes to the Georgia Composite Medical Board, which oversees the licensing and regulation of physicians in the state.[15] Georgia law also

---

[12] In *Kibler v. Northern Inyo County Local Hosp. Dist.*, 39 Cal 4th 192(2006), the Supreme Court of California held that a hospital's peer review qualifies as an "official proceeding authorized by law" under California's version of OCGA § 9-11-11.1(a)(2). And in *Bonni v. St. Joseph Health System*, 11 Cal 5th 995 (2021), the court held that statements made during and in connection with peer review proceedings qualified as protected activity under California's anti-SLAPP statute.

[13] See, e.g., *Giraldi*, 374 Ga. App. at 353(1) n.1.

[14] Ga. Comp. R. & Regs., r. 111-8-40-.11(b)(2).

[15] See OCGA § 31-7-8 (requiring institutions to submit a written report to the appropriate licensing board under certain circumstances, including when a staff member's medical privileges are "denied, restricted, or revoked for any reason involving the medical care given his patient[,]" and when a member voluntarily

grants legal protections to peer review and medical review proceedings, including immunity for individuals and witnesses who participate in the proceedings and confidentiality and absolute privilege for the records of those proceedings.[16]

Additionally, we have previously held that "issues before the State Bar involving conduct of attorneys are official proceedings authorized by law" within the meaning of the anti-SLAPP statute,[17] and we see clear similarities between the State Bar's attorney misconduct proceedings and a hospital's peer review proceedings. For all of these reasons, we now hold that hospital peer review proceedings are official proceedings authorized by law within the meaning of the anti-SLAPP statute. Consequently, Drs. Tritt and Drexinger have made a threshold showing that Dr. Harms's breach of duty claims are based on protected activity.

---

resigns or restricts his privileges as a result of action initiated by the institution); § 43-34-5 (listing the powers and duties of the Georgia Composite Medical Board).

[16] See *Patton v. St. Francis Hosp.*, 260 Ga. App. 202, 204-05(1)(a), 206-09(1)(c) (581 SE2d 551) (2003) (discussing immunities and privileges afforded to peer review and medical review proceedings by OCGA §§ 31-7-130 et seq.; 31-7-140 et seq.; and the HCQIA).

[17] *Jefferson v. Stripling*, 316 Ga. App. 197, 199-200 (1) (728 SE2d 826) (2012) (where an attorney sued defendants for making complaints to the State Bar, in which they alleged misconduct by the attorney, the attorney's suit was subject to the anti-SLAPP statute).

(ii)   Next, we must determine whether Dr. Harms has established a probability of prevailing on these claims.[18] Drs. Tritt and Drexinger argue that these claims fail for want of duty, and we agree.

"In order to have a viable negligence action, a plaintiff must satisfy the elements of the tort, namely, *the existence of a duty on the part of the defendant*, a breach of that duty, causation of the alleged injury, and damages resulting from the alleged breach of the duty."[19] A legal duty can arise by statute or by common law; however, "as the Supreme Court of Georgia has recently held, there is no general legal duty to all the world not to subject others to an unreasonable risk of harm."[20] "The existence of a legal duty … is a question of law for the court."[21]

Dr. Harms's complaint does not identify a precise basis for the legal duty he is claiming Drs. Tritt and Drexinger breached when they submitted a falsified report to

---

[18] See *Neff*, 346 Ga. App. at 525.

[19] *Rasnick v. Krishna Hospitality*, 289 Ga. 565, 566 (713 SE2d 835) (2011) (citation omitted; emphasis added).

[20] *Stanley v. Garrett*, 356 Ga. App. 706, 709(1) (848 SE2d 890) (2020) (citations and punctuation omitted).

[21] *Maynard v. Snapchat, Inc.*, 313 Ga. 533, 535-36(2) (870 SE2d 739) (2022) (citation and punctuation omitted).

11

the MEC. In his brief on appeal, however, Dr. Harms argues that a duty to provide only accurate and truthful information to peer review committees arose from the hospital's Credentials Policy, from 42 USC § 11111(a)(2) and OCGA § 31-7-132(b) (both of which grant immunity to individuals who provide information to peer review proceedings "unless such information is false and the person providing it knew that such information was false"), and from a Georgia regulation and criminal law provision regarding the keeping of patients' medical records. We are not persuaded.

As to Dr. Harms's contention that the hospital's Credentials Policy can serve as the basis for a breach of duty claim, we agree with the defendants that, putting all else aside, Dr. Harms cannot prevail on such a claim because he voluntarily resigned from EJCH.[22]

---

[22] Under *St. Mary's Hosp. of Athens v. Radiology Professional Corp.*, 205 Ga. App. 121 (421 SE2d 731) (1992), and its progeny, a physician's ability to sue a hospital for breach of its bylaws is limited. And as we recently observed, our Court held in *Rowell v. Phoebe Putney Mem. Hosp.*, 338 Ga. App. 603, 606-07(2) (791 SE2d 183) (2016), that "no *St. Mary's* claim existed even though [a] question of fact remained as to whether the hospital violated its bylaws with respect to suspending physician's staff privileges *because privileges were never actually suspended and physician made the unilateral decision to resign*[.]" *Othman v. Navicent Health, Inc.*, 373 Ga. App. 240, 247(1) (908 SE2d 223) (2024) (emphasis supplied).

As to Dr. Harms's reliance on 42 USC § 11111(a)(2) and OCGA § 31-7-132(b), those provisions, by their terms, grant immunity from liability for civil money damages to individuals who participate in peer review proceedings and describe the limited circumstances under which the immunity granted therein does not apply. They make no mention of a private cause of action, and Dr. Harms has pointed to nothing in the language of those provisions, or their history, suggesting that the legislature intended to create an implicit civil cause of action.[23]

Dr. Harms's reliance on provisions regarding the keeping of patients' medical records is similarly unavailing. The regulation relied upon by Dr. Harms provides that "[a]ll entries in the patient's medical records shall be accurate and legible and shall contain sufficient information to support the diagnosis and to describe the treatment provided and the patient's progress and response to medications and treatments[,]"[24] while the statute he cites provides that "[a]ny person who, with intent to conceal any material fact relating to a potential claim or cause of action, knowingly and willfully

---

[23] See *Jastram v. Williams*, 276 Ga. App. 475, 476 (623 SE2d 686) (2005) (considering and rejecting appellant's claim that various statutes created an implicit civil cause of action).

[24] Ga. Comp. R. & Regs., r. 111-8-40-.18(2).

destroys, alters, or falsifies any record shall be guilty of a misdemeanor."[25] Neither of these provisions includes any basis for us to infer that the legislature intended to create a private legal duty[26] — particularly a duty like the one asserted here; that is, a duty owed by the author of a patient's medical records to another physician — and we reject Dr. Harms's conclusory argument that these provisions should be interpreted as creating such a duty.

We therefore conclude that Dr. Harms has failed, at step two of the anti-SLAPP analysis, to show a probability of success on his breach of duty claims. Thus, we reverse the trial court's denial of the defendants' motions to strike these claims.

### (c) Tortious Interference (Count 5)

Dr. Harms alleges that the defendants tortiously interfered with his prospective and existing business relationships with Northside and Resurgens. Because Dr. Harms is no longer pursuing claims relating to the defendants' communications with Northside, we decline to review whether the trial court erred by allowing those claims to proceed.

---

[25] OCGA § 16-10-94.1(b).

[26] See *Jastram*, 276 Ga. App. at 476.

14

As to Resurgens, the record establishes that Dr. Harms was employed by this private practice when the investigation began; his employment contract was for a two-year term, with a commencement date of September 6, 2022. On September 19, 2024, Resurgens told Dr. Harms it would not be renewing his contract. In its letter, Resurgens advised: "This decision comes after careful consideration of the current uncertainty regarding your hospital privileges. Unfortunately, this has hindered your ability to meet our business needs in a timely manner." In his complaint, Dr. Harms alleges that his suspension from EJCH caused him to be unable to fulfill his obligations for Resurgens, resulting in the non-renewal of his employment contract.

Dr. Harms brought claims for tortious interference against all three defendants: Emory, Dr. Tritt, and Dr. Drexinger. To determine whether the trial court erred by allowing the claims to survive the defendants' anti-SLAPP motions to strike, we will address each category of defendant separately.

(i) Dr. Harms's tortious-interference claims against Drs. Tritt and Drexinger as witnesses in the peer review proceeding survive the motions to strike. These claims are based on statements the defendants allegedly made in connection with the peer review process — specifically, their submission of a fraudulent

neuromonitoring report to the MEC. Thus, for the reasons discussed above, we conclude that the defendants have shown, at step one of the analysis, that the claims arise from protected activity. The next question is whether Dr. Harms has met his burden of establishing a probability of success under step two of the anti-SLAPP analysis.

> The elements of tortious interference with contractual relations, business relations, or potential business relations are: (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure;[27] (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.[28]

The defendants insist that Dr. Harms has failed to make the requisite showing, but their only specific argument on this point is their contention that Dr. Harms

---

[27] Malice, as used here, encompasses any act on the part of a defendant that constitutes "unauthorized interference, or any interference without legal justification or excuse." *Renden, Inc. v. Liberty Real Estate Ltd.*, 213 Ga. App. 333, 334(2) (444 SE2d 814) (1994).

[28] *Tribeca Homes, LLC v. Marathon Inv. Corp.*, 322 Ga. App. 596, 599-600(2) (745 SE2d 806) (2013) (citation and punctuation omitted).

"cannot allege" that Resurgens's renewal of his employment contract was "likely to develop in fact." We disagree. Based on the timing of Resurgens's decision not to renew Dr. Harms's contract and Resurgens's stated explanation for its decision, a jury could conclude that the peer review proceeding was the primary cause of that decision. Further, viewing the limited record before us in the light most favorable to Dr. Harms,[29] a jury could conclude that the modified neuromonitoring report was an important element of the peer review proceeding. Finally, neither party has pointed to any evidence specifically addressing the likelihood of Resurgens renewing Dr. Harms's employment contract if he had not been under review. Under these circumstances, the defendants have not demonstrated that the trial court erred by denying their motions to strike these claims.

(ii)    Dr. Harms's tortious-interference claims against Emory and Dr. Tritt in his role as a member of the MEC also survive the motion to strike because the defendants have not shown that they arise from protected activity. Unlike his tortious-interference claims against Drs. Tritt and Drexinger as witnesses in the peer review proceeding, which are clearly based on their submission of a neuromonitoring report

---

[29] See *Zeh*, 312 Ga. at 652(1)(c).

to the MEC, it is not entirely clear what conduct forms the basis of Dr. Harms's claims against Emory and Dr. Tritt as a member of the MEC. Consequently, we cannot conclude that these claims are subject to being stricken under the anti-SLAPP statute at this time. As mentioned above, the defendants bear the burden, at step one of the anti-SLAPP analysis, of establishing that the claims they have moved to strike arise from activity that is protected by the anti-SLAPP statute.[30] They have not done so here, and so we conclude that the trial court did not err by denying their motion to strike these claims.

2. The defendants argue that the trial court erred in failing to grant their motions to dismiss. We will analyze this claim of error only as to the claims that, based on our conclusions in Division 1, survive the motions to strike: declaratory judgment (Count 1), breach of bylaws (Count 2), and tortious interference (Count 5).

> [U]nder the [Civil Practice] Act, pleadings are to be construed liberally and reasonably to achieve substantial justice consistent with the statutory requirements of the Act. Thus, a motion to dismiss for failure to state a claim should not be granted unless the allegations of the complaint disclose with certainty that the claimant would not be entitled to relief under any state of provable facts asserted in support thereof. Put

---

[30] See *Giraldi*, 374 Ga. App. at 350-351(1).

another way, if, within the framework of the complaint, evidence may be introduced which will sustain a grant of relief to the plaintiff, the complaint is sufficient.[31]

"An appellate court reviews de novo a trial court's ruling on a motion to dismiss, accepting as true all well-pled material allegations in the complaint and resolving any doubts in favor of the plaintiff."[32]

*(a) Declaratory Judgment (Count 1)*

Dr. Harms asked the trial court to declare both that he was entitled to a hearing and that, because the defendants denied him such a hearing, they "are not entitled to the protections of 42 USC § 11111(a)(1)" — an immunity provision of the HCQIA which provides, generally, that if a professional review action meets the standards specified in the Act, the review body and its members shall not be liable for money damages with respect to the action.[33] By its terms, this immunity provision applies

---

[31] *Campbell v. Ailion*, 338 Ga. App. 382, 384-85 (790 SE2d 68) (2016) (citations and punctuation omitted).

[32] *Golden v. Floyd Healthcare Mgmt.*, 319 Ga. 496, 496-97 (1) (904 SE2d 359) (2024) (citation and punctuation omitted).

[33] Specifically, 42 USC § 11111(a)(1) provides:
> (1) Limitation on damages for professional review actions. If a professional review action (as defined in section 431(9) [42 USCS §

only if the professional review action "meets all the standards specified [in the Act,]"[34] including the requirement that the physician be given adequate notice and hearing procedures, or other such procedures as are fair under the circumstances.[35]

The defendants contend the trial court erred in denying their motions to dismiss this claim because, even if the allegations of the complaint are accepted as true, Dr. Harms was not entitled to a hearing.

Before addressing the defendants' arguments, we note two points. First, we will limit our review of this issue to the arguments raised by the defendants. We express no opinion on other possible challenges to Dr. Harms's declaratory judgment claim

---

11151(9)]) of a professional review body meets all the standards specified in section 412(a) [42 USCS § 11112(a)], except as provided in subsection (b)— (A) the professional review body, (B) any person acting as a member or staff to the body, (C) any person under a contract or other formal agreement with the body, and (D) any person who participates with or assists the body with respect to the action, shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to the action.

[34] Id.

[35] See 42 USCS § 11112(a)(3) (to enjoy the immunity provided by § 11111(a), a professional review action may be taken only "after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances[ ]").

20

— including whether a declaratory judgment is the proper vehicle for the question Dr. Harms seeks to have resolved.[36] Second, as Dr. Harms expressly acknowledges, the HCQIA does not create a private right of action, so the HCQIA *itself* cannot serve as the basis to hold the defendants liable to Dr. Harms. But unless the Act's immunity provision applies, the defendants could potentially be liable to Dr. Harms under *other* theories of law.

With those caveats in mind, we now turn to the arguments raised by the parties. Again, the HCQIA provides that, for a professional review body and its members to enjoy the immunity provided by 42 USC § 11111(a), their professional review action must be taken only "after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances[.]"[37] "[A] professional review action shall be presumed to have met the requisite conditions for immunity unless the presumption is rebutted by a

---

[36] "The proper scope of declaratory judgment is to adjudge those rights among parties upon which their future conduct depends." *SJN Properties v. Fulton County Bd. of Assessors*, 296 Ga. 793, 802(2)(b)(iii) (770 SE2d 832) (2015) (citation and punctuation omitted).

[37] 42 USC § 11112(a)(3).

preponderance of the evidence[,]" and "[t]he plaintiff bears the burden of proving the peer review process was not reasonable as a matter of law."[38]

In support of his contention that he was not afforded adequate notice and hearing procedures in this case, Dr. Harms asserts that he was entitled to a hearing under the Credentials Policy.[39]

Section 7.A.1(a) of the Credentials Policy provides, in pertinent part, as follows.[40]

> An individual is entitled to request a hearing whenever the Medical Executive Committee makes one of the following recommendations: (1) denial of initial appointment, . . . ; (2) revocation of appointment or

---

[38] *Taylor v. Kennestone Hosp., Inc.*, 266 Ga. App. 14, 19(2) (596 SE2d 179) (2004) (citation and punctuation omitted).

[39] The parties do not contend, and we do not hold, that complying with a hospital's policies or bylaws is always the same as affording adequate notice and hearing procedures under the HCQIA. But Dr. Harms argues that it was improper for the hospital to deny him a hearing because he was entitled to a hearing under the Credentials Policy; he does not raise a meaningful argument that, regardless of what hearing-rights the Credentials Policy afforded, it was unfair for the hospital to deny him a hearing in this case.

[40] The defendants attached the Credentials Policy as an exhibit to their verified answer, and "[i]n assessing whether a claim should be dismissed, a court may consider exhibits attached to and incorporated into the complaint and answer." *Love v. Fulton County Bd. of Tax Assessors*, 311 Ga. 682, 683 (859 SE2d 33) (2021).

Clinical Privileges; (3) suspension of Clinical Privileges for more than thirty (30) Days (other than precautionary suspension) . . . ; (4) *a Restriction of Clinical Privileges for more than thirty (30) Days*; or (5) denial of reinstatement from a leave of absence if the reasons relate to professional competence or conduct.[41]

In the "Definitions" section of the Credentials Policy, "Restriction" is defined as follows.

"RESTRICTION" means a professional review action that: (a) is recommended by the Medical Executive Committee as part of an investigation or agreed to by the Practitioner while he or she is under investigation or in exchange for the Medical Executive Committee not conducting an investigation or taking an adverse professional review action; and (b) limits the individual's ability to independently exercise his or her clinical judgment (i.e., a mandatory concurring consulting requirement in which the consultant must approve the course of treatment in advance or a proctoring requirement in which the proctor must be present for the case and has the authority to intervene in the case, if necessary).

Restrictions do not include the following, whether recommended by the Medical Executive Committee or by any other Medical Staff committee: (a) general consultation requirements, in which the Practitioner agrees

---

[41] (Emphasis added).

to seek input from a consultant prior to providing care; (b) observational proctoring requirements, in which the Practitioner agrees to have a proctor present to observe his or her provision of care; and (c) other collegial Performance Improvement efforts, including informational letters, educational letters, or voluntary Performance Improvement plans that are suggested by the Medical Staff leadership and voluntarily agreed to by the Practitioner as a part of the routine professional practice evaluation process.

The defendants contend that Dr. Harms was not entitled to a hearing under the Credentials Policy because his clinical privileges were not restricted for longer than 30 days. Dr. Harms, however, insists that his privileges were restricted for far longer than 30 days.

The relevant dates are not in dispute. On April 3, 2024, Dr. Tritt placed Dr. Harms on precautionary suspension; on April 9, the MEC met and decided to impose a proctoring requirement; on April 24, the proctoring period began; on May 22, the MEC elected to conclude the proctoring period even though it had not completed its investigation; on May 24, Dr. Harms voluntarily agreed not to exercise his clinical privileges during the remainder of the investigation; on August 15, the MEC completed its investigation and reinstated Dr. Harms's privileges subject to a

performance improvement plan ("PIP"); on September 5, Dr. Harms, through counsel, sent the MEC a letter demanding that he either be given a hearing or be permitted to relinquish his privileges in good standing, and the hospital responded that the PIP did not trigger the right to a hearing under Emory's Credentials Policy. Dr. Harms formally relinquished his privileges at EJCH on October 14, 2024.

Dr. Harms contends that the restrictions on his clinical privileges began on April 9, when the MEC recommended a proctoring requirement, because "at that moment, Dr. Harms was not permitted to conduct surgeries at EJCH without a proctor." But as outlined above, Dr. Harms was subject to a precautionary suspension as of April 3, and the Credentials Policy expressly provides that the imposition or continuation of a precautionary suspension does not trigger the right to a hearing.[42] The precautionary suspension continued until April 24, when the proctoring period began. And as Dr. Harms acknowledges, the proctoring period itself did not last longer than 30 days.

Dr. Harms further contends that the restrictions on his clinical privileges lasted past the end of the proctoring period because his voluntary agreement to refrain from

[42] See § 6.H.2(f) of the Credentials Policy ("There is no right to a hearing based on the imposition or continuation of a precautionary suspension.").

exercising clinical privileges while the investigation was pending was not truly voluntary. But this position is foreclosed by precedent: in *Rowell v. Phoebe Putney Memorial Health*, where a physician chose to voluntarily resign rather than face a probable summary suspension of her privileges, this Court held that because the triggering event never occurred — that is, because the plaintiff's medical privileges were never actually summarily suspended — she had no viable claim that she was wrongly denied a hearing.[43] In accordance with *Rowell*, we conclude that because the undisputed facts of this case show that Dr. Harms's clinical privileges were never actually restricted for more than 30 days, the defendants did not violate the Credentials Policy by denying his request for a hearing. Consequently, Dr. Harms has failed to rebut the presumption that the defendants afforded him adequate notice and hearing procedures,[44] and the trial court should have granted the defendants' motions to dismiss his claim for declaratory judgment.

*(b) Breach of Bylaws (Count 2)*

---

[43] 338 Ga. App. at 607.

[44] See *Taylor*, 266 Ga. App. at 19(2).

This claim, which Dr. Harms raised only as to Emory, is premised on his allegation that Emory violated the Credentials Policy by denying his request for a hearing. In light of our conclusion above that Dr. Harms was not entitled to a hearing under the Credentials Policy, this claim must be dismissed.

*(c) Tortious Interference as to Resurgens (Count 5)*

The defendants contend, without elaboration, that Dr. Harms cannot sustain this cause of action because he "cannot allege" that Resurgens's renewal of his employment contract was "likely to develop in fact" if not for the defendants' allegedly wrongful actions. But as we noted in Division 1(c)(i), supra, nothing in the record establishes how likely Resurgens was to renew or terminate its contract with Dr. Harms. And considering the timing of Resurgens's decision and its stated rationale, Dr. Harms may be able to establish that the peer review investigation is what led to Resurgens's decision to terminate his contract. We therefore conclude the defendants have failed to demonstrate that, viewing the allegations of the complaint as true and in the light most favorable to the plaintiff, Dr. Harms will be unable to

introduce evidence within the framework of the complaint to establish a tortious interference claim against the defendants.[45]

For the foregoing reasons, we conclude that the trial court erred by denying the defendants' motions to dismiss and motions to strike, except with respect to Dr. Harms's tortious interference claims regarding Resurgens (Count 5). Accordingly, we affirm the trial court's order as to Count 5 and otherwise reverse.

*Judgment affirmed in part and reversed in part. Brown, C. J., and Barnes, P. J., concur.*

---

[45] See *Campbell*, 338 Ga. App. at 385 (motion to dismiss standard); *Tribeca Homes*, 322 Ga. App. at 598(2) (elements of a tortious interference claim: "(1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff[ ]") (citation and punctuation omitted).